**E-FILED**
Wednesday, 23 January, 2008  03:17:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

JOLENE M. MOSS,                        )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )            Case No. 06-1288
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security        )
Administration,                        )
                                       )
            Defendant.                 )

# O R D E R

This matter is now before the Court on Plaintiff's Motion to Reverse and the Commissioner's Motion for Summary Affirmance.  For the reasons set forth below, Plaintiff's Motion to Reverse [# 11] is DENIED, and the Commissioner's Motion for Summary Affirmance [#14] is GRANTED.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship, and the amount in controversy exceeds $75,000.00.

## BACKGROUND

Plaintiff, Jolene Moss ("Moss"), was 46 years' old at the time of her administrative hearing.  (R529) She is 5'2" tall and weighs about 140 pounds.  Id.  She has a high school education and lives with her husband and adult daughter.  (R529-30)  In the past, Moss has

been employed as a cashier and housekeeper.  (R531-33)  She last worked as a cashier and stock person at a gas station until leaving that job in September 2003. (R531)

On October 10, 2003, Moss applied for disability insurance benefits ("DIB"), alleging disability that began on September 10, 2003.  (R61-63)  Her application was denied both initially and on reconsideration.  (R25-28, R32-35)  Moss requested a hearing before an administrative law judge ("ALJ").  (R36-38)  A hearing was held before ALJ Barbara J. Welsch on January 24, 2006, at which Moss, who was represented by counsel, and vocational expert ("VE") Bob Hammond appeared and gave testimony.  (R526)

Moss testified that her right ankle was shattered in an accident, which causes constant pain and difficulty sleeping.  (R533)  Her foot and leg ache and she has no feeling in her toes and ball of her right foot.  (R534)  She takes 1,200 mg of Neurontin, 1,300 mg of Tylenol arthritis formula, and 3,200 mg of Motrin for this condition, which takes the edge off for a little bit but don't help her pain very much.  Id.  The pain makes it difficult for her to concentrate and focus.  (R535, R544)  However, she has declined her doctor's offer to issue her a prescription for Percocet or Darvocet to help her pain because it made her constipated and drowsy.  (R543-44)  Moss cannot comfortably sit or stand for very long, and when she walks, she shifts her weight to her left side, which causes additional pain in her back, leg, hip.  (R535)  She must also elevate her leg to prevent swelling.  (R543)

On a typical day, Moss will get up around 5:00 a.m. and exercise her foot and ankle while sitting up in bed.  (R535)  She goes into the kitchen, makes coffee, takes her Motrin, and feeds her dogs and cat.  (R536)  Moss tries to do what housework she is able to do, but she can no longer squat and bend.  Id.  She also fixes the meals.  Id.  She can no longer do laundry because the washer and dryer are in the basement of her house, but

- 2 -

after her husband or daughter bring the laundry up from the basement, she can fold it and put it away.  (R537)  Her husband does the shopping, and she occasionally accompanies him but has difficulty walking through the store.  Id.

Moss does not belong to any groups and watches television in the evenings but doesn't pay much attention.  Id.  She reads books, although it takes her longer to finish a book than it used to.  (R537-38)  She has friends and family in the area but does not visit with them much because of her pain.  (R538)  Moss has not traveled out of state since her accident and does not know how to use a computer.  Id.  She has a driver's license but hasn't driven for at least a year and hasn't been able to do the yard work since her accident.  (R540) During the summer, she sometimes uses her cane to go for a walk around the block or up and down the driveway.  (R541)  She can bathe and dress herself using a little bench to sit on.  (R542) Moss smokes a pack of cigarettes each week.  Id.  In her present condition, she does not believe that there is any work that she is capable of performing.  (R545)

The ALJ presented the VE with the following hypothetical:

> I would like you to consider an individual who is 46 years old with a high school education, past relevant work as you have outlined.  An individual who would be limited to let's start with sedentary work with no jobs that would require climbing stairs, ladders, ropes, scaffolds and jobs that would require minimal amounts of standing and walking to perform the work so basically a sit down job.  How would these restrictions affect the past performance of the past relevant work?

(R546)  VE Hammond testified that this hypothetical individual could not perform Moss' past relevant work.  Id.  Because her past relevant work was unskilled, she has no transferrable skills that could apply to other jobs.  Id.

- 3 -

The ALJ then asked the VE whether there were examples of positions that would fit the hypothetical if it were amended to allow the performance of unskilled, entry level jobs.  Id.  The VE responded that the hypothetical individual could then perform work as a cafeteria cashier, for which there are 3,000 positions in the national economy, an ampule sealer, for which there are 6,500 positions in the national economy, or a surveillance system monitor, for which there are 2,500 positions in the national economy.

On April 13, 2006, the ALJ issued her decision.  (R11)  The ALJ found that Moss' combination of impairments was a "severe" impairment based on the requirements in the Regulations.  (R16)  The ALJ determined, however, that Moss does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (R18)  After considering the medical evidence in the record and relevant credibility factors, the ALJ found that Moss had not provided credible evidence that she lacks the residual functional capacity to perform sedentary work with the additional limitations of: (1) no climbing of stairs, ladders, ropes, or scaffolding; (2) jobs which require no more than minimal standing or walking to perform; and (3) limitation to unskilled work based on her "possible" problems with concentration due to subjective complaints of pain.  (R19)  Based on the evidence of record and these findings, the ALJ concluded that while Moss could not perform her past relevant work, she was not under a disability as defined in the Social Security Act (the "Act") because she could perform jobs that exist in significant numbers in the national economy. (R21-22)

Moss submitted a Request for Review of Hearing Decision.  (R8-10)  On September 12, 2006, the Appeals Council declined review of her claim, and the ALJ's decision became

the final decision of the Commissioner.  (R4-7)  This appeal followed.  The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step test.  *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580 (1986).

In her appeal, Moss' pleadings raise essentially three claims: (1) that the ALJ erred by making an incomplete determination at step 2; (2) that the ALJ's determination at step 3 was legally insufficient; and (3) that the ALJ failed to consider an entire line of evidence

favorable to Moss.  The Court disagrees and finds that the ALJ's finding that Moss has the residual functional capacity to perform the physical exertion and nonexertional requirements a limited range of sedentary, unskilled work is supported by substantial evidence.

Moss first argues that while the ALJ ultimately concluded that she had a severe impairment within the meaning of the regulations, she failed to mention all of her impairments, which materially effected her determination of Moss' residual functional capacity (RFC) and her determinations at step 5.   Specifically, she argues that her impairments such as pain, migraine headache, lower extremity neuropathy, numbness and tingling in the fingers have were not considered or utlitized in the hypothetical questions presented to the VE during the hearing.

With all due respect, Moss has misconstrued the import of the step 2 analysis.  Step 2 requires an ALJ to determine whether a claimant's impairment is severe; step two ends there.  There is no requirement or appropriate basis to consider the claimant's RFC or other factors at that point because they are properly considered in the subsequent steps of the analysis.  Thus, the ALJ properly found that Moss's ankle condition qualified as a severe impairment because it "more than minimally affect[ed] her ability to perform work related activity" and went on the next step of the analysis.  The Commissioner correctly notes that step 2 is a threshold inquiry that must be satisfied to proceed to the subsequent steps of the analysis.  As the ALJ found that Moss had satisfied that requirement, Moss' step 2 argument as presented is unavailing.[1]

---

[1] The real claim to be asserted is that the ALJ failed to consider the other asserted impairments in determining Moss' RFC and resultant ability to perform work

Moss' second claim is that the ALJ's determination at step 3 was legally insufficient because the ALJ erroneously determined that she did not meet or medically equal an impairment listed in the regulations.  Although she argued only the application of Listing 1.03 at the time of her hearing, she now contends that her impairments met or medically equaled Listing 1.03 or 1.02(A).  Listing 1.03 recognizes an impairment for "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  Section 1.00B2b then provides:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place fo employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the ability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

---

in the national economy, which is discussed in her other claims.

Moss concedes that a "narrow reading" of § 1.00B2b1 "would seem to support the ALJ's conclusion." This is a necessary concession because while it is undisputed that Moss has undergone reconstructive surgery of a major weight bearing joint, it is also undisputed that she does not require the use of a two-handed assistive device to ambulate. Rather, she testified that she uses a single cane when she walks. As § 1.00B2b1 clearly defines "ineffective ambulation" as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," it is clear that Moss does not satisfy the criteria for ineffective ambulation under this section.

That being said, she argues that she nevertheless meets the listing because she satisfies the requirements of § 1.00B2b2. Moss' claims that she has not been able to undertake full weight bearing on her right ankle since her initial surgery are belied by the medical evidence of record. Her surgeon's notes from October 22, 2003, indicate that Moss was allowed to do weight bearing shortly after her surgery. (R299-300) She was encouraged to continue to ambulate with full weight bearing on November 10 and 19, 2003. Id. Moss has not cited and the Court has not otherwise observed any other medical evidence of record finding that she was not capable of bearing full weight while walking or was otherwise not capable of effective ambulation as defined in § 1.00B2b.

The most she offers is a report by Dr. Steven Kodros from March 2004 in which he observed that she uses a cane for ambulation and had a "steppage gait pattern" with "an antalgia on the right side." (R306) In other words, she has assumed a gait that favors her right side in order to avoid pain. After reviewing the CT scan of her ankle, Dr. Kodros concluded that surgical intervention was not indicated and recommended that she continue

conservative management, including the use of a customized brace and corticosteroid injections.  (R304-05) Moss' attempt to characterize this evidence as Dr. Kodros having observed "ineffective ambulation" is unavailing.  The definition of "ineffective ambulation" set forth in § 1.00B2b clearly does not encompass an individual who is able to walk with one cane while favoring her right side.

In November 2003, Moss' physical therapists documented her ability to walk 250 feet with the use of her cane and bearing 60-70% of her weight.  (R141) By December 2003, the physical therapists noted "dramatic improvement" and her ability to ambulate more than 600 feet using her cane with no noted limitation on her ability to bear full weight.  (R335)

Dr. Steven Norris noted that she had a pretty good range of motion, that she was "doing well", walking with a cane, and was "doing several things at home but in general has progressed very nicely" on January 8, 2004.  (R316)  In February 2005, Dr. Kodros noted that Moss had not obtained the customized brace that he had recommended and had not undergone any further treatments for her ankle.  (R423) At that time, she was able to ambulate around his office with a steppage antalgic gait pattern on the right.  Id.  Again, this does not document ineffective ambulation within the meaning of the listings.  This would appear to indicate the absence of any objective medical support for an inability to bear full weight on her right ankle or any more severe limitation than ambulating with a cane while adjusting her gait to favor her right side.

That leaves Moss' subjective assertion that her pain results in severe limitations that make it impossible for her to ambulate effectively.  The ALJ discounted this testimony. The record indicates that in considering Moss' alleged pain and functional limitations, the

ALJ gave full consideration to the medical evidence of record and fully considered her subjective complaints of pain and limitation.  It is well-settled that "[a]n ALJ may discount subjective complaints of pain [or limitation] that are inconsistent with the evidence as a whole."  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  Such credibility determinations may not be overturned by this Court unless they are patently wrong.  Herr v. Sullivan, 912 F.2d 178, 182 (7th Cir. 1990); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

In reaching the conclusion that Moss' testimony was not fully credible regarding her alleged pain and functional limitations, the ALJ relied on the following facts.  Treatment notes have reflected no hospitalizations or anything other than conservative treatment for her conditions following her initial surgery.  No physician has made findings significant enough to recommend any further treatment.  Rather, the record establishes that Moss was capable of full weight bearing within a short time after her surgery, had a "pretty good" range of motion, was capable of walking more than 600 feet with a cane, and favors her right side when she walks.  The record also indicates that Moss went for long periods of time (from January 2004 until March 2005) without seeking treatment from her family physician.  She is not obtaining treatment from a pain clinic or participating in physical therapy or seeking any other kind of treatment to alleviate her alleged pain.

Moss testified that she was able to dress and groom herself, prepare meals, do some chores around the house, walk around the block, and occasionally accompanies her husband to do the shopping.  Thus, the record indicates that she engages in some average daily activities and largely takes care of her own personal needs.  She takes only conservative medication for her pain and testified that she has rejected prescription pain medication in favor of Tylenol Arthritis formula and Motrin.  Such abilities are largely

inconsistent with her claims of total disability based on pain and ineffective ambulation within the meaning of the listing. After a review of the entire record, this Court finds that the ALJ's credibility determination was not patently wrong but was, in fact, reasonable and supported by substantial evidence in the record.

Moss further asserts that she meets the criteria of Listing 1.02(A), which provides:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A) Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 CFR Pt. 404, Subpt. P, App. 1 § 1.02(A). She argues that her condition involves her right ankle and that there is evidence of gross anatomical contracture with bony deformity and early degenerative changes.

Even assuming that her attorney had argued the application of § 1.02A and that the record supported Moss' assertions of a gross anatomical deformity, her argument would nevertheless fail because the Court has previously concluded that she has failed to meet her burden of demonstrating an inability to ambulate effectively as defined in § 1.00B2b.

Moss next suggests that the ALJ did not consider whether her impairments were medically equal to any listing. In Scheck v. Barnhart, 357 F.3d 698, 700 (7th Cir. 2004), the Seventh Circuit noted that a state agency Disability Determination and Transmittal forms "conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and

reconsideration levels of administrative review.'"  The Court went on to hold that where there was no evidence from treating physicians addressing the issue of medical equivalency, it was "unnecessary for the ALJ to articulate her reasons for accepting the state agency physicians' determination of not disabled."  Id., at 701; Ribaudo v. Barnhart, 458 F.3d 580, 584 (7th Cir. 2006).

Here, Moss' argument is frivolous based on the well-established precedent in this circuit.  The ALJ clearly had before her and considered Disability Determination and Transmittals completed by state agency physicians on initial denial and reconsideration. As her physicians did not address the question of medical equivalence  and provided no evidentiary support for the position that she met or equaled any listing, it was unnecessary for the ALJ to articulate her reasons for accepting the state agency physician's determinations.  Therefore, Moss has failed to meet her burden of demonstrating that the ALJ erred in her finding at step three of her analysis.

Finally, Moss contends that the ALJ erred by failing to consider and properly weigh an entire line of evidence that was favorable to her.  Specifically, she asserts that the ALJ virtually ignored and failed to analyze the evidence presented by Dr. Kodros.  Moss points to notations made by Dr. Kodros after reviewing x-rays of her ankle that suggested a possible incomplete healing or non-union of the fracture.  However, she fails to acknowledge the significance of the fact that after reviewing a follow-up CT scan, Dr. Kodros retracted this observation and clarified that there had been a bony union and that the fracture was in fact healed.  (R304, R424) While he also noted a bony defect on the dorsal aspect of the talar neck, he did not place any significance on this finding.  Id.  To the contrary, Dr. Kodros effectively dismissed the bony defect as accounting for the false

- 13 -

indication of non-union on the prior x-rays.  Id.  He also indicated findings that "could be consistent with evidence of disruption of circulatory status and perhaps suggest the possibility of avascular necrosis" that could warrant additional follow-up to evaluate to determine whether there was avascular necrosis.  (R304-05)

When Moss was examined a year later, Dr. Kodros observed some degree of degenerative changes and generalized disuse osteopenia, but did not observe any segmental collapse and was unable to say with any certainty whether there was avascular necrosis.  (R423-24) Dr. Kodros continued to recommend conservative management, including the use of a custom molded brace, activity modification, use of over-the-counter nonsteroidal anti-inflammatory medications, her prescribed Neurontin, periodic ice, and corticosteroid injection.  (R424)

Moss also makes much of a sentence in Dr. Kodros' notes from her March 2004 visit to the effect that "[s]he has been unable to return to work because of her injury."  (R306) However, her reliance on this sentence is misplaced, as it appears in the history segment of the report, which is primarily based on information provided by the patient, rather than the examination findings, assessment, or plan sections that represent the considered judgment of the physician.

The ALJ specifically discussed Dr. Kodros' reports in her opinion, noting that what was thought to be a possible non-union of the fracture was ruled out by the subsequent CT-scan indicating a well-healed fracture.  (R17) The ALJ observed that no further surgical treatment was recommended, an orthotic brace was prescribed to help with her walking, and continued management with conservative measures was recommended.  Id.  The ALJ also acknowledged that Dr. Kodros' speculation regarding possible future symptoms was

precisely that – speculation – and did not constitute findings.  Id.  She further noted that the contemporaneous exam yielded no findings to confirm either possibility.  Id.  Finally, the ALJ emphasized that the lack of any findings indicating any problem with weight bearing or ambulation that would indicate a medical need for the use of a cane.  Id.

On March 3, 2004, Dr. Rakesh Garg, a consultative neurologist, examined her and found normal strength in all four extremities, as well as only slight limitation of the movement of the right ankle.  (R303) She demonstrated a "slight decrease in sensation to pin prick in the bottom of the right foot especially the front toe and ball of the foot, but the rest of the foot is normal."  Id.  Deep tendon reflexes were normal, with good knee and ankle reflex on both sides.  Id.  Her neurological exam was essentially normal with no indication of any injury of any major nerve.  Id.

The other medical evidence of record similarly fails to substantiate Moss' complaints of debilitating limitation.  Despite her complaints of disturbed sleep and increased pain with ambulation, she was capable of walking more than 600 feet by the time she finished physical therapy following her accident.  (R335) She was returned to full weight bearing by her surgeon, Dr. Roy, within two months after her surgery.  (R299-300)  Her family physician, Dr. Norris, concluded that she was progressing nicely and doing well.  (R316) While Dr. Norris did diagnose her with hypothyroidism, there is no indication that this condition was not controlled by the prescribed medication.  (R320)

Moss makes reference to her suffering weakness, muscle weakness, dizziness, numbness, tingling in her hands, loss of left eye vision, and alludes to having been diagnosed with multiple sclerosis.  However, such findings are not present on the page cited in support of her assertion.  Moss complained of severe headache and numbness in

September 2000 and was seen by Dr. Edward Pegg.  (R403-04) Although an initial MRI showed "questionable lesions," Dr. Pegg consulted with another neuroradiologist, who opined that the lesions were consistent with migraine headaches and not indicative of multiple sclerosis.  (R403)  Moss apparently misunderstood his diagnosis, as she later claimed that she had been told that there was an 85% chance that she had multiple sclerosis; Dr. Pegg firmly rebuts this claim in his October 17, 2000, letter, as well as his efforts to correct Moss' misimpression.  Id.

Dissatisfied with Dr. Pegg's opinion, Moss sought the opinion of Dr. Maria Karbowska-Jankowska in December 2000 with respect to her complaints of fatigue, numbness, and tingling in her fingers and toes.  (R399) Dr. Karbowska-Jankowska found that her condition was suggestive of complicated migraines and that there was insufficient data to support a diagnosis of multiple sclerosis.  (R401)  Such complaints are also found in the record in the subjective patient history section of consultative radiology reports from January 2001.  (R370-74)  However, these reports note no focal abnormalities, a normal cervical spine, and a normal spinal cord.  Id.  Additionally, a February 2001 neurological report by Dr. Jorge Kattah indicates that while Moss had suffered a visual disturbance in her left eye on July 4, 2000, it was resolved over a three hour period.  (R393) Examination on January 31, 2001, demonstrated 20/20 visual acuity and normal optic nerves, and Dr. Kattah opined that her symptoms were suggestive of a migraine sequence.  (R393-94) Her family physician, Dr. Norris, also recorded that Moss was not experiencing any visual troubles following her accident in September 2003.  (R341)

The record indicates that Moss continued to be able to work during the time that she was being evaluated for these migraines up to the time of her automobile accident.

Following her automobile accident, Moss' medical complaints have focused primarily on issues relating to her ankle condition, and none of her treating physicians since the alleged onset of her disability have suggested that these prior conditions have significantly limited her ability to perform work.   References indicating that the ALJ did consider these conditions are contained in her opinion even though Moss did not complain of such ailments during the hearing. (R17, 20-21)   Accordingly, the Court finds that there is substantial evidence in the record to support the ALJ's determination that while Moss' impairments do result in some limitation, she is not limited to the degree claimed.

Finally, Moss challenges the ALJ's RFC assessment and resulting hypothetical for failure to consider her claimed additional limitations.  However, such complaints were not testified to by Moss during her hearing.  Moreover, the Court has found that the medical evidence regarding these complaints was in fact considered by the ALJ in her opinion and determined to be not supportive of the existence of any significant limitations at the time of the hearing.  Thus, the ALJ's RFC assessment was not unsupported by medical evidence in the record, and there is no other RFC assessment or specific findings in the record contradicting the ALJ's RFC findings.  Moss' professed additional limitations were properly discounted for the reasons discussed above, and the ALJ was therefore not required to take them into account in determining Moss' RFC.

The ALJ recognized impairments from Moss' ankle condition that would preclude her from more than sedentary work, with no exposure to climbing stairs, ladders, ropes, scaffolds.  She was also limited to jobs that would require minimal amounts of standing and walking to perform the work, basically resulting in a sit down job.  From these limitations, the VE concluded that Moss was not capable of performing her past relevant work.  That

being said, however, the VE found that she was capable of performing unskilled, sedentary work as a cafeteria cashier, ampule sealer, or surveillance system monitor, for which positions exist in significant numbers in the national economy.

It was completely proper for the ALJ to omit from the hypothetical any limitations based on statements by Moss which the ALJ found to be not fully credible, assertions entitled to little weight in light of a lack of medical support in the record as a whole, or the unsupported arguments by her attorney.  Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 540 (7th Cir. 1992).  Because substantial evidence supports the ALJ's residual functional capacity finding, her hypothetical question which included the same limitations was appropriate.  "All that is required is that the hypothetical question be supported by the medical evidence in the record."  Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987); Cass v. Shalala, 8 F.3d 552, 555-56 (7th Cir. 1993).

This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record.  Rather, the medical records simply failed to compel the conclusion that Moss is disabled within the meaning of the Act.  Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

**CONCLUSION**

For the reasons set forth herein, Plaintiff's Motion for Summary Reversal [#11] is

DENIED, and the Commissioner's Motion to Affirm [#14] is GRANTED.  This matter is now

TERMINATED.

ENTERED this 23rd day of January, 2008.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge